IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BRENDA L. HARRISON,            *
                               *
        Plaintiff,             *
                               *
vs.                            * Civil Action No. 05-00179-BH-B
                               *
JO ANNE B. BARNHART,           *
Commissioner of                *
Social Security,               *
                               *
        Defendant.             *

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Brenda L. Harrison ("Plaintiff") brings this action seeking judicial review of the final decision of the Commissioner of Social Security denying her claim for period of disability and disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 401 <u>et seq</u>.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Oral argument was held on October 31, 2005.  Upon careful consideration of the administrative record and memoranda of the parties, it is hereby recommended that the decision of the Commissioner be **AFFIRMED.**

I.  <u>Procedural History</u>

Plaintiff protectively filed an application for period of disability and disability insurance benefits on August 30, 1996, alleging an onset of disability on October 1, 1988, based on chronic back pain and arthritis in her arms and knees.  (Tr. 294-301, 342).  Plaintiff's application was denied initially and upon

reconsideration, and she timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Id. at 133-137, 210-224, 393). On June 26, 1997, ALJ Glay E. Maggard held an administrative hearing, which was attended by Plaintiff, her representative and a vocational expert. (Id. at 51-85). ALJ Maggard, on October 8, 1997, issued an unfavorable decision. (Id. at 138-148, 152-184). The Appeals Council ("AC") granted Plaintiff's request for review and remanded the case for further proceedings on May 24, 1999 on the basis that the record was incomplete. (Id. at 230-236).

A second administrative hearing, slated for May 22, 2000, was continued to allow additional time for gathering medical records. (Id. at 86-93). On November 11, 2000, a third administrative hearing was continued in order to ensure that all of the medical evidence had been received and made a part of the file. (Tr. 94-98). ALJ James A. Smith ("ALJ Smith"), on June 14, 2001, conducted an administrative hearing which was attended by Plaintiff, her representative and a vocational expert. (Id. at 98-119). On June 29, 2001, ALJ Smith issued an unfavorable decision. (Id. at 185-202). After granting Plaintiff's request for review, the AC, on July 25, 2003, remanded the case and directed the ALJ to "[g]ive further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of the

assessed limitations (Social Security Ruling 96-8p)." (<u>Id</u>. at 271-274, 338-341).

On January 21, 2004, a fifth hearing was held before ALJ Smith, which was attended by Plaintiff, her representative and a vocational expert. (<u>Id</u>. at 120-132). On April 2, 2004, ALJ Smith issued an unfavorable decision wherein he determined that Plaintiff's severe impairment of chronic lumbosacral strain does not meet or equal a Listings impairment; she retains the residual functional capacity ("RFC") to perform sedentary work; and she is capable of working in jobs which exist in significant numbers in the national economy, such as sedentary assembler, surveillance system monitor and check cashier, as enumerated by vocational expert testimony. (<u>Id</u>. at 19-34). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Act. (Tr. 19-34). On February 18, 2005, the AC denied Plaintiff's request for review, making ALJ Smith's April 2, 2004 decision the final administrative decision of the Commissioner. (<u>Id</u>. at 13-15). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

## II.  <u>Background Facts</u>

Plaintiff was born on August 28, 1957, and was 46 years old at the time of the January 21, 2004 administrative hearing. (Tr. 101, 123, 294). Plaintiff has a 12th grade education and work experience as a boatswain's mate, dental assistant, cashier, switchboard

3

operator and, temporarily, as an electronics assembler. (Id. at 32, 34, 356-366, 394-396, 409-411).

At the June 26, 1997 hearing, Plaintiff testified that she was injured in a fall in September 1988 while she was employed with the Naval Reserve, NAS Dallas, Texas. (Id. at 55-56, 156-157). According to Plaintiff, she suffered a broken pelvis and broken arm, and received extensive medical treatment. (Id.) Plaintiff testified that to treat her pain, she typically takes over-the-counter pain medication (Tylenol) every day, as her prescriptions make her sleepy; however, she does take her prescriptions on and off, just not every day (such as Amitriptyline, Lortab). (Id. at 74-76). As for activities of daily living, Plaintiff testified that she can do her own housework, she watches television 6-7 hours per day, she drives a car, she attends to her personal needs, and she sometimes attends church. (Id. at 73-74). She also reported that her injuries impair her ability to care for her children and that she can no longer garden or mow the grass without difficulty due to her impairments. (Tr. 64-65, 75). As a result of her injuries, Plaintiff was honorably discharged in November 1989 as not physically fit to remain in service. (Id. at 67, 167). Plaintiff received a 10% service connected disability rating from the VA in 1991 for pelvic injuries sustained in the fall. (Id. at 313, 837-841). Her disability rating was later increased to 20% in

2000.[1]   (Id. at 313-319, 400-408).

At the June 14, 2001 hearing, Plaintiff testified that the last time she worked was in 1993, soldering and building antennas on an assembly line; however, she could only perform that job part-time for about 3 months about 3-5 hours per day, due to difficulties with her back/neck from sitting down/standing, knee trouble, and her broken arm and pelvis.   (Id. at 103-107). Plaintiff testified that as a result of the injuries sustained in the fall, she does not feel that she can perform any of her prior jobs, she has limited use of her hand, and she cannot sit for lengthy amounts of time.   (Id.)  She has not had any surgery on her back or received any treatment for her back in over 24 months; however, in the past, she was treated with a TENS unit, was placed in traction, and was diagnosed with lumbosacral strain, degenerative joint disease and DDD, from which she suffers pain in her back, neck and knees, making it difficult to stand, walk more than ½ block and sit more than 20-25 minutes.   (Tr. 103-104, 108-111).

During 2000, Plaintiff's former husband, Timothy Harrison ("Mr. Harrison"), testified at a deposition concerning Plaintiff's condition.   (Id. at 320-333).  He testified that Plaintiff suffered from severe back problems, which worsened after her fall.   (Id.)

---

[1]On September 13, 2000, the VA awarded Plaintiff an additional 10% disability rating based on lumbosacral strain.   (Id.)

According to Mr. Harrison, Plaintiff had problems caring for their children, was unable to pick them up or spend a lot of time on her feet, and experienced difficulty standing/walking. (<u>Id</u>.)

## III.   <u>Issues on Appeal</u>

A.   Whether the ALJ erred by finding medical improvement, to allow Plaintiff to perform a full range of sedentary work without a sit/stand option?

B.   Whether the ALJ erred by failing to develop the record pursuant to the Appeals Council's 1999 remand order?

C.   Whether the ALJ erred by failing to assign weight to the testimony of Plaintiff's husband and in determining her credibility?

D.   Whether the ALJ erred by failing develop a full and fair record regarding Plaintiff's vocational opportunities, and by failing to ask the VE whether the evidence he provided conflicted with the <u>Dictionary of Occupational Titles</u> ("DOT") and to obtain a reasonable explanation for any apparent conflict?

## IV.   <u>Analysis</u>

### A.   <u>Standard of Review</u>

In reviewing claims brought under the Act, this Court's role is a limited one.  This Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).[2]  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Sewell v. Bowen</u>, 792

---

[2]This Court's review of the Commissioner's application of legal principles is plenary.  <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").   In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

   **B.   Discussion**

   An individual who applies for Social Security disability benefits must prove her disability.  20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.

7

20 C.F.R. §§ 404.1520, 416.920.[3]  See, e.g., Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997).

In the case sub judice, the ALJ concluded that Plaintiff has not engaged in substantial gainful activity since October 1, 1988, and that she met the disability insured status requirements through December 31, 1993.  (Tr. 22-34).  The ALJ further found that while Plaintiff's chronic lumbosacral strain is a severe impairment, it does not meet or medically equal any of the Listings impairments; her subjective allegations of pain and functional limitations are not fully credible; she retains the RFC to perform work at the sedentary level; and while she is precluded from performing her PRW

---

[3]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

as an electronics assembler, there are a significant number of other sedentary jobs that she can perform including sedentary assembler, surveillance system monitor and check cashier, such that she is not under a "disability" as defined in the Social Security Act. (Id.)

Based upon a review of the record, the undersigned finds that substantial evidence of record supports the ALJ's decision. Relevant[4] records reveal that Plaintiff has a history of treatment at various Naval Hospitals, (Tr. 421-437, 439-561, 563-646, 667-669, 673, 684-685, 708-757, 842-872), as follows:

- September 11-30, 1988: Plaintiff was hospitalized for premature labor, fractured pelvis and fractured right elbow following a 15-16 foot fall on September 11th. Dr. LeCompte operated on her right elbow to correct the fracture. She was diagnosed with a right elbow fracture and a closed fracture of her right ilium and ischium (pelvis). Her thoracic, lumbar and cervical spine x-rays were negative and she was discharged after having a cast placed on her elbow and undergoing pelvic surgery. Discharge records reveal that physical therapy was consulted and she was given a walker. She was discharged in good condition, with her right arm in a cast. Dr. LeCompte restricted her from running, marching, physical training and from lifting, pushing or pulling over 20 pounds, and she was directed to seek follow-up treatment through the Orthopedic Clinic.

- December 13, 1988: The restrictions imposed by Dr. LeCompte were continued.

- January 1989: Plaintiff was seen by neurologist Dr.

---

[4]While the undersigned has reviewed the entire record, only those records which relate to Plaintiff's claims on appeal (i.e., which are "relevant"), are set forth herein.

Neuren. She reported pain in back, neck and elbow. Her elbow and hip were evaluated to determine whether she could return to duty with the pin in place (not due to be removed until June 1989).

- <u>March 1989</u>: Plaintiff was seen by Dr. LeCompte for complaints of constant back/bilateral knee and pelvic pain. Her x-rays were normal. She was also seen at Naval Hospital Branch Clinic for complaints of knee/back pain. The physical exam revealed that she had decreased range of motion, abnormal gait, accentuated lordosis/straightening, negative SLR, and positive pain to palpation along spurious processes and thoracic area. The diagnostic impression was M-S back strain 2 degrees to severe trauma and positive pelvic fracture; r/o spinal compression fracture; r/o left knee boney injury; MCL strain or MM tear. She was directed to take Motrin for her pain, to exercise/rehab and to get L-spine/knee x-rays.

- <u>March 21, 1989</u>: Dr. LeCompte's treatment notes reflect that she continued using a walker. Since surgery, she developed a functional range of motion in her right elbow and ambulates well unassisted. Dr. LeCompte continued to restrict her from running, marching, or physical training and from lifting, pushing or pulling more than 20 pounds with her right arm until June 1989, at which time he anticipated that she would be able to return to full physical therapy training with possibly a lack of ability to utilize the right arm fully. He also anticipated that after the hardware (pin) is removed in September 1989, she would experience a gradual return to full activity with right upper extremity; he noted that she had successful healing and rehabilitation of her fractures.

- <u>April 1989</u>: A medical evaluation board narrative summary was completed by Dr. LeCompte. An examination of Plaintiff's lower back revealed tenderness over the lumbosacral junction, no SI joint tenderness and negative straight leg raising. Her lumbar spine x-rays were normal. Her knee exam showed stable knees without significant crepitus or ligamentus laxity; her knee x-rays were normal; she had some tenderness over pubic symphysis and in

10

right inguinal area; and pelvic x-rays revealed a healing fracture on the right inferior ramus and evidence of osteitis of pubic symphysis. She was diagnosed with status post ORIF, right elbow; dorsal and lumbar spine pain; knee pain, osteitis of pubic symphysis; status post fracture, right pelvic inferior rami; and depression. She was placed on Tolectin, given physical therapy consult and referred for mental health treatment.

- <u>April 7, 1989</u>:[5] A medical review board was convened to consider Plaintiff's fitness to continue in the Naval Reserve. X-rays of her right elbow revealed a well-healed fracture. She exhibited normal ranges of motion; dorsal spine x-rays were normal. She exhibited tenderness at T-7 and T-9; her lower back exam revealed tenderness over the lumbosacral junction, no SI joint tenderness, and negative straight leg raising; x-rays were normal. Her knees revealed no significant crepitus or ligamentus laxity and x-rays were normal. She exhibited some pubic tenderness and her pelvis x-rays revealed a healing fracture. She was referred to physical therapy and asked to continue with her weight loss program.

- <u>June 1989</u>: Dr. LeCompte treated Plaintiff for right elbow fracture, pelvic fracture, multiple musculoskeletal complaints and for depression. She was assessed with atypical depression and r/o major depression.

- <u>October 1989</u>: Plaintiff had a follow-up visit.

- <u>1991</u>: Plaintiff was assessed with back pain, neck pain, s/p ORF elbow, osteitis of pubic symphysis and depression.

- <u>February 1991</u>: Plaintiff complained of back pain. X-rays were ordered.

- <u>September 1992</u>: Plaintiff complained of long standing chronic pain.

---

[5]Plaintiff appealed the decision of the medical review board, that she could return to duty on May 20, 1989, but the decision was affirmed on July 20, 1989. (<u>Id</u>. at 855).

- <u>March 1993-August 1993</u>: Plaintiff complained of pain in her neck/shoulders.

- <u>August 1993</u>: Plaintiff complained of neck/shoulder pain; she was assessed with cervical muscle spasm/exogenous high stress.

- <u>May 10, 1994</u>: Col. Lipton's treatment notes reflect that Plaintiff had "intractable pain following multiple fractures of pelvis [-] should not do prolonged standing or sitting for an indefinite period."

- <u>November 21, 1995</u>: Plaintiff complained of recurring left hip and back pain becoming increasingly severe and more frequent over the 7 year period since her 1988 fall. She had difficulty getting on the exam table. She was diagnosed with LBP ("lower back pain") with radicular symptoms.

- <u>November 1995</u>: Plaintiff received outpatient treatment at Pensacola Naval Hospital ("PNV") for complaints of LBP/hip pain radiating to knees. She was not given any restrictions. She was instructed to resume normal activity and was referred to orthopedics for assistance. Notes reflect she left office in a wheelchair.

- <u>December 19, 1995</u>: Plaintiff's examination at PNV revealed no motor sensory deficits in her lower extremities and no root tension signs. X-rays of her lumbar spine and AP pelvis were unremarkable. Robert B. Lurate, M.D. ("Dr. Lurate") emphasized that "underlying treatment would be a conditioning program." She was referred to the orthopedic clinic due to long history of chronic LBP, which appeared to be getting more severe and frequent in the past 7 years. She was diagnosed with chronic LBP.

- <u>February 1997 through December 1997</u>: Plaintiff had thirteen doctors' visits during this period. Her chief complaints were LBP and knee pain. X-rays for her chronic LBP were normal. She was able to toe/heel walk but had decreased ROM (flexion 20 degrees) and tender lumbar areas. Her treatment included Robaxin and Lortab, a heating pad and

physical therapy. She was later prescribed Elavil. She was assessed with chronic LBP and given the short term goal of decreased pain symptoms 25% overall and increasing her range of motion by about ½ over the next month. Her long term goal was self-management of condition. Her rehabilitation potential was noted as "fair." By September, she was reporting that her knee pain had improved to such an extent that she was able to mow her grass with less pain afterwards. And treatment notes reflect that in December, she reported that her back/knee pain had improved and she was tolerating the Elavil.

On September 25, 1996, Plaintiff underwent a consultative examination by orthopedist Raymond R. Fletcher, M.D. ("Dr. Fletcher"), for her complaints of LBP, which worsen with prolonged sitting/standing, and pain in both knees and elbows. (Tr. 419-420). Upon physical examination, Dr. Fletcher noted that Plaintiff ambulated normally; could heel/toe walk normally; had normal posture; exhibited some generalized subjective tenderness in the lumbar spine without spasm; had no tenderness in the sciatic notch; had 80% forward bending of the lumbar spine; had positive straight leg raising on both sides with some LBP; normal range of motion in her wrists, elbows, shoulders, ankles, knees and hips; normal reflexes in both her upper and lower extremities; and had full range of motion in her cervical spine. (Id.) Dr. Fletcher opined that Plaintiff had chronic lumbar sprain; traumatic amputation, DIP joint left index finger and ankylosis DIP joint left long finger (from 1986 car accident); history of pelvic fracture with 1 cm right leg length discrepancy; history of ORIF, right olecranon

fracture with full function; and cigarette abuse. (<u>Id</u>. at 420).
Dr. Fletcher concluded that Plaintiff may have difficulties with
activities requiring bending, lifting, stooping, twisting, or
prolonged standing, walking, or sitting, due to chronic LBP. (<u>Id</u>.)

On December 27, 1996, a State Agency medical consultant
reviewed Plaintiff's medical records, and completed a Residual
Functional Capacity Assessment ("RFC"). (<u>Id</u>. at 384-391). The
consultant opined that Plaintiff could occasionally lift/carry up
to 20 pounds; frequently lift/carry up to 10 pounds; stand/walk
with normal breaks for a total of 6 hours in an 8 hour workday; sit
with normal breaks for a total of 6 hours in an 8 hour workday; has
an unlimited ability to use her feet/hands to push/pull; can
frequently climb/balance; and can occasionally stoop, kneel, crouch
or crawl. (<u>Id</u>.)

On December 14, 1999, Paul H. Fellers, Jr., M.D. ("Dr.
Fellers") conducted an examination of Plaintiff. (Tr. 650-652).
Plaintiff reported headaches and back and knee pain, aggravated
with prolonged sitting and stressful activity to the lumbar spine.
(<u>Id</u>.) Dr. Fellers found no evidence of lumbar spine abnormalities,
and while he noted tenderness at the lumbosacral junction on deep
pressure, he noted no paraspinous muscle spasms. (<u>Id</u>.) Plaintiff
had a full active range of motion to forward flexion, extension,
lateral bending and axial rotation; intact neurological sensation;
no weakness in lumbar nerve roots L1-S1 with equal strength

14

bilaterally graded 5/5; negative straight leg raising; palpation revealed tenderness beneath both patellae with compression; bilateral knee exam was negative; no abnormal alignment noted; x-rays of her lumbar spine revealed no abnormalities. (Id.) He diagnosed Plaintiff with chronic lumbosacral strain and probable chronic chondromalacia patella. (Id. at 652). He recommended a MRI of her lumbar spine and exercises for her lower back/knees. (Id.)

On March 14, 2000, State Agency physician Peter S. Bertucci, M.D. ("Dr. Bertucci") completed a Physical Capacities Evaluation ("PCE"). (Tr. 653). He concluded that Plaintiff could sit for 6 hours at once and 6 hours in an 8 hour day; stand/walk for 5 hours at once and 5 hours in an 8 hour day; frequently lift/carry up to 20 pounds; occasionally lift/carry up to 25 pounds; use hands/feet to perform repetitive actions; continuously reach; frequently climb/crawl; and occasionally bend/squat. (Id.)

1.  **Whether the ALJ erred by finding a medical improvement, to allow Plaintiff to perform a full range of sedentary work without a sit/stand option?**

Plaintiff alleges that the ALJ erred by failing to cite medical opinions and/or evidence and to provide an "articulated explanation" to support his finding of an improvement in Plaintiff's Residual Functional Capacity ("RFC"), so as to allow her to perform a full range of sedentary work before her last insured date, in violation of Marbury v. Sullivan, 957 F.2d 837,

840-841 (11th Cir. 1992) (Johnson, J., concurring).[6]

In his April 2, 2004 decision, the ALJ concluded that Plaintiff maintains the ability to perform sedentary work without the need for a sit/stand option. (Tr. 22-34). This represents an "improvement" in Plaintiff's RFC, because in the earlier June 2001 administrative decision, it was determined that Plaintiff could perform at the sedentary level and required a sit/stand option. (Id. at 188-201). However, Plaintiff's claim - that the ALJ did not cite medical opinions and/or evidence to support, or provide an "articulated explanation" of, his RFC finding of medical improvement - is incorrect.

In his April 2, 2004 decision, the ALJ specifically stated that he assigned "determinative evidentiary weight" to the findings and evidence of various military doctors, clinics and hospitals who treated Plaintiff, as well as to her treating and examining physicians (for instance, Drs. Lipton and LeCompte, and treatment records from various Navy and Army clinics and hospitals). (Tr. 29). The ALJ stated further, that he did not assign evidentiary weight to the findings of the State Agency medical consultants and

---

[6]The concurring opinion provides that an ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians. Id.

non-examining State Agency physicians[7]. (<u>Id</u>.)  From there, the ALJ
engaged in a thorough discussion of how he arrived at Plaintiff's
RFC, noting that he assigned appropriate evidentiary weight to the
credible findings and conclusions of her treating and examining
physicians; that the record contains a lack of clinical findings
corroborating her pain complaints as well as a lack of evidence of
regular or persistent medical treatment during the relevant period;
and that her allegations, of an inability to work due to subjective
symptoms, were "not entirely credible." (<u>Id</u>. at 28-31).  The ALJ
also noted that the treatment records failed to document persistent
reliable manifestations of a disabling loss of functional capacity
by Plaintiff resulting from her reported debilitating pain and
other symptomatology, and that her physical exams failed to
document any objective clinical findings such as muscle weakness,
muscle atrophy, sensory disruption and/or motor disruption. (<u>Id</u>.
at 30-31). <u>See</u> <u>also</u> <u>supra</u>.

The ALJ's RFC finding is supported by substantial record
evidence, including the following: Dr. LeCompte's June and August
1989 physical examination findings (which were normal and showed no
abnormalities); Plaintiff's lack of medical treatment in 1990 and
very limited treatment from 1991 through 1994; a finding in 1997

---

[7]It is significant to note that the ALJ's RFC finding of
sedentary work was actually more restrictive than the finding of the
State Agency physicians, who opined that Plaintiff could perform work
at the "light" level.

that Plaintiff had a 40% decrease of her overall symptoms, "noticeable improvement" of her LBP, and overall improvement of her alleged pain as a whole; Dr. Bertucci's 2000 PCE which revealed she had 5/5 strength, no lumbar abnormalities, full active range of motion, no weakness and normal lumbar x-rays; the VA's disability rating rulings in 1991 and 2000, that Plaintiff was not entitled to permanent and total disability, but rather, was only entitled to a 10% disability rating for her lumbosacral strain and a 10% disability rating for her pelvic fracture (for a total of only 20%); Plaintiff's testimony that she did not receive any treatment for her back in over 24 months prior to her May 2000 administrative hearing, and her own reports of decreasing pain (particularly in 2003 which she reported was a "0" on the pain scale of 1-10). See supra. See also (Tr. 30-31, 67-72, 102-103, 111-113, 313-320, 400-408, 760, 765, 837-841). Additionally, Plaintiff's reported ADLs, such as being able to mow the grass, care for her personal needs, drive a car, shop, etc., further support the ALJ's RFC determination. (Id.)

Moreover, the ALJ was not required, by the AC's remand order, to obtain testimony of a medical expert, as Plaintiff suggests. An ALJ is not required to receive testimony of a medical expert, and RFC determinations are for an ALJ to make based upon all of the relevant evidence of record regarding a claimant's remaining ability to work despite her impairments. See, e.g., Lewis v.

<u>Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).  Here, the AC's remand order only suggested that a medical expert be contacted **"if warranted and available."**  (Tr. 273 (emphasis added)).  The ALJ's thorough RFC discussion in his decision reveals that there was sufficient medical evidence of record for him to render his RFC finding such that contacting a medical expert was simply not warranted.  (<u>Id</u>. at 22-34).

Furthermore, Plaintiff's reliance upon <u>Marbury</u> for her claim is misplaced.  Here, the ALJ did not substitute his opinion for that of Plaintiff's treating physicians; rather, as specifically articulated in his decision, he assigned "determinative evidentiary weight" to the findings of Plaintiff's treating physicians.  <u>See supra</u>.  And none of Plaintiff's treating physicians ever concluded that her alleged impairments were of disabling severity, nor did any consulting or reviewing physicians ever conclude that she was disabled due to her alleged impairments.  (<u>Id</u>.)  As a result, Plaintiff's claim fails.

**2.   <u>Whether the ALJ erred by failing to develop the record pursuant to the Appeals Council's 1999 remand order</u>?**

Plaintiff contends that the ALJ erred by failing to properly develop the record by not locating "missing" medical records from military or VA facilities as directed by the AC's 1999 remand order.  While Plaintiff is correct that the ALJ is charged with developing a full and complete record, the record evidence reflects

19

that the ALJ properly discharged his duty.   <u>See</u>, <u>e.g.</u>, <u>Welch v.</u>
<u>Bowen</u>, 854 F.2d 436, 438 (11th Cir. 1988); <u>Todd v. Heckler</u>, 736 F.2d
641, 642 (11th Cir. 1984); <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735-
736 (11th Cir. 1981); 20 C.F.R. §§ 404.1512(d), 416.912(d).

In his 2004 decision, the ALJ stated as follows with regard to
the development of the record post-remand:

> . . . . Based upon the claimant's request for review, the
> Appeals Council remanded the case on May 24, 1999, on the
> basis that the record had not been fully developed . . .
> . In its remand order, the Appeals Council relied on
> allegations made by the claimant that a "large part of
> her medical records" from military hospitals were
> missing.   The   Appeals   Council   instructed   the
> Administrative Law Judge . . . to contact the claimant
> and request that she supply a complete list of all
> military and VA facilities where she had been treated or
> examined since 1990.   The Appeals Council directed the
> ALJ to then obtain the missing records from those
> sources.
>
> **Pursuant to the Appeals Council remand order, the ALJ**
> **obtained a list of all previously unobtained treatment**
> **sources (i.e. Carswell AFB Hospital, Patterson Army**
> **Community Hospital, and Branch Medical Clinic in New**
> **Jersey) from the claimant and requested the claimant's**
> **treatment records from the same. The ALJ notes that the**
> **claimant's attorney also requested copies of the**
> **claimant's treatment records from these sources. The**
> **medical records obtained from these sources were admitted**
> **into evidence** and are found at Exhibits 9F through 15F in
> the evidentiary record. **The ALJ further notes that the**
> **hearing in this case was postponed on two occasions to**
> **allow additional time for receipt of all requested**
> **treatment records.**
>                 * * *
> The Administrative Law Judge notes that **no additional**
> **relevant medical evidence has been submitted since the**
> **date of the last unfavorable decision issued on June 29,**
> **2001. Other medical records and reports relating to the**
> **claimant's current medical treatment have been admitted**

**into evidence**, but those documents do not contain any information relative to the period during which the claimant must establish the existence of a medically determinable severe impairment of such severity as to constitute disability for Title II purposes, i.e., October 1, 1988 to December 31, 1993.

Following the remand . . . **additional medical records were received from the following treating sources: (1) Ortho/Podiatry Clinic, Carswell AFB (Dr. Michael LeCompte); (2) The Internal Medicine Clinic and the Acute Care Clinic, Pensacola Naval Hospital (Dr. Varkey Philip, Dr. J.M. Chimiate, and Dr. Robert V. Lamppert); (3) Branch Medical Clinic, Colts Neck, New Jersey; and (4) Patterson Army Community Hospital, Ft. Monmouth, New Jersey (Dr. Michael R. Dunham, Dr. Edward W. Olkowski, Dr. Stanley B. Archer[,] and Dr. Jacob Tasher)**. **These treatment records cover the period of time from March, 1989 through April, 2000** . . .

\* \* \*

As noted above, **numerous attempts have been made to obtain missing treatment records, and, in fact, additional records for the period May 1989 through April 2000 have been obtained**. However, careful review of the volumes of medical records detailing the claimant's sporadic medical treatment since 1988 demonstrate the claimant's near full recovery from her October 1988 traumatic orthopedic injuries. **It is the [ALJ's] belief that no additional treatment records or other medical evidence relative to the period at issue exists. All medical evidence necessary for the proper adjudication of the claimant's disability claim is contained in the current evidentiary record and any other treatment records would only be duplicative**. **Moreover, neither the claimant, nor her attorney, has alleged that any additional treatment records are necessary for the adjudication of the claimant's case since the June 14, 2001 hearing.** **Consequently, the Administrative Law Judge finds that the evidentiary record in this case is complete**.

**Every reasonable effort has been made to develop the claimant's "complete medical history"** pursuant to 20 CFR Section 404.1512(d). **The Administrative Law Judge finds that the evidence of record is adequate to determine**

21

**whether the Claimant is disabled and that no further
evidence is required** . . . . In addition, the
Administrative Law Judge[] emphasizes that the claimant
bears the burden of proving that she is disabled, and,
consequently, she is responsible for producing evidence
in support of her claim . . . .

* * *

(Tr. 22, 26-27, 31).

As a preliminary matter, it is important to note that on
February 18, 2005, the AC denied Plaintiff's request for review of
the ALJ's 2004 decision, and in so doing, found no basis (such as
a failure to fully develop the record) for remanding this case.
(Id. at 13-18). Additionally, a careful review of the ALJ's
decision reveals that notwithstanding Plaintiff's assertions, the
ALJ discussed, in detail, the many efforts undertaken to obtain
additional military records. See supra. The ALJ noted that
additional records had actually been obtained for the May 1989-April
2000 time period, and that Plaintiff did not allege that any other
records existed and/or were necessary to adjudicate her claim. (Tr.
31). Moreover, interestingly, in her brief, Plaintiff failed to
identify any additional records which should have been obtained.
Furthermore, during the administrative hearings, Plaintiff conceded
that there were no other records for treatment for her back in the
1998-April 2000 time frame, and that the records on hand did not
contain much pain information/treatment until the first of 1997 (a
date well after her October 1, 1988 onset date, and well after the
December 31, 1993 last insured date). (Tr. 70-72, 103-104).

Finally, while Plaintiff argues that the ALJ was required to document, in his decision, evidence showing that he requested the State Agency's assistance and that the certified records administrator at the facility was contacted, this is simply incorrect.  The AC's remand order only directed the ALJ to contact Plaintiff, to request that she supply a list of all the military and VA facilities where she was treated and/or examined since 1990 as well as a list of the clinics at each facility where she received treatment.  See supra.  The ALJ did so.  Contrary to Plaintiff's assertion, the AC directed the ALJ to additionally request State Agency assistance and to contact the certified records administrator only **_[i]f necessary_.**  (Tr. 235 (emphasis added)).  The voluminous record, and the ALJ's statement that "[a]ll medical evidence necessary for the proper adjudication of the claimant's disability claim is contained in the current evidentiary record and any other treatment records would only be duplicative[]" (Id. at 31), demonstrate that the ALJ clearly determined that the record was sufficient to render a disability determination.  Therefore, it was unnecessary for the ALJ to contact either the State Agency or a certified records administrator.  Thus, Plaintiff's claim fails.

   3.   **Whether the ALJ erred by failing to assign weight to the testimony of Plaintiff's husband and in determining her credibility?**

Plaintiff contends that the ALJ erred by disregarding her husband's testimony about her pain, which impacted his credibility

determination.  On December 28, 2000, Plaintiff's husband, Timothy Harrison ("Mr. Harrison"), testified that his wife suffered an accident in 1988; that she received medical treatment for her injuries through the Navy and Army from July 1991-May 1994; that she was having trouble with back spasms; that her back condition caused her problems, such as picking up their children and being unable to do yard work and/or heavy house work; and that he observed her having difficulty standing and walking, and saw her cry in pain. (Tr. 320-333).

Under the Social Security Regulations, testimony of a witness shall be considered by the ALJ in his decision regarding a claimant's disability, and under 20 C.F.R. §§ 404.1512 and 404.1513(d), statements by spouses can be considered other evidence of a claimant's impairments.  In his decision, the ALJ assessed Plaintiff's credibility, as well as her husband's testimony, noting as follows:

> The Administrative Law Judge also notes that the claimant's representative obtained a sworn statement from the claimant's husband, Timothy Harrison, on December 28, 2000. [] In his statement, Mr. Harrison testified that his wife had a lot of back pain in 1991 which caused her difficulty caring for their home and their children. He also testified that, at times, he observed his wife having difficulty with standing and walking. **However, Mr. Harrison's statements regarding the severity of his wife's pain and her difficulties relative to that pain appear to be based solely on his wife's statements to him inasmuch as he could not know the true severity of someone else's pain and he failed to provide specific examples of instances or occurrences substantiating his otherwise conclusory statements**.

24

                              * * *
The claimant's statements concerning her alleged physical impairments and their impact on her ability to work are not entirely credible. **While it is credible that the claimant experienced some functional limitations secondary to her chronic lumbosacral strain and healed pelvic fracture, it is not credible that she experienced the level of pain and functional limitation to the extent she has alleged**. This conclusion is supported by the fact that the treatment records fail to document persistent reliable manifestations of a disabling loss of functional capacity by the claimant resulting from her reported debilitating pain and other symtpomatology. Additionally, physical examinations have failed to document any objective clinical findings such as muscle weakness, muscle atrophy, muscle spasm, or sensory or motor disruption, and the disparity between the medical evidence in the record and the claimant's symptomatic allegations is considerable.
                              * * *
Based on a review of the medical evidence of record, as well as the claimant's testimony at the hearing . . . the preponderance of evidence contained in the record does not support the claimant's allegations of totally incapacitating pain and other symptoms, and that **the claimant's statements regarding the severity, frequency, and duration of her symptomatology are overstated**. Therefore . . . **the claimant's allegation of inability to work because of the subjective complaints is not fully credible**.

(Tr. 26, 30-31 (citations omitted) (emphasis added)).  Although the

testimony of Plaintiff's spouse is not detailed in the credibility

discussion portion of his decision, the ALJ did address the

testimony provided by Plaintiff's husband in his decision, finding

it was based solely upon her statements to him, and thus, should be

discounted.

    While Plaintiff argues that the ALJ erred in discounting the

spouse's statement on the basis that he was merely restating his

                              25

wife's statements, it is of no moment.  This is because a claimant's statements, or for that matter, her spouse's statements, about pain or other symptoms will not, standing alone, establish disability; rather, medical signs and laboratory findings which show a medical impairment which could reasonably be expected to produce the symptoms alleged must be present.  See, e.g., Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986)).  See also SSR 96-7p.  In the case at hand, Plaintiff acknowledged that she received only conservative treatment for her allegedly disabling impairments and the record reflects that she recovered from her traumatic fall in 1988, and received only sporadic treatment thereafter.  See supra.  In fact, at the 2001 administrative hearing, Plaintiff admitted that she had not received any treatment for her back in the about 2 years, and that her medical records did not contain many references to pain complaints until 1997.  (Id.)  Moreover, the ALJ noted that Plaintiff's physical exams failed to document any objective clinical findings like muscle weakness, muscle atrophy, sensory disruption, motor disruption, and that her treatment notes failed to document persistent reliable manifestations of a disabling loss of functional capacity by Plaintiff resulting from her reported debilitating pain and other symptomatology. (Id.) See also (Tr. 30-31).  In the face of such evidence, the ALJ did not err in discounting the weight given to Plaintiff and her spouse's statements regarding the

26

severity of Plaintiff's pain.  <u>See</u>, <u>e.g.</u>, <u>Jones v. Bowen</u>, 810 F.2d 1001, 1004 (11th Cir. 1986).  Accordingly, Plaintiff's claim fails.

> **4.** **<u>Whether the ALJ erred by failing develop a full and fair record regarding Plaintiff's vocational opportunities, and by failing to ask the VE whether the evidence he provided conflicted with the Dictionary of Occupational Titles ("DOT") and to obtain a reasonable explanation for any apparent conflict</u>?**

Plaintiff alleges that the ALJ erred by failing in his obligation to develop a full and fair hearing record regarding the vocational opportunities available to her in violation of SSR 00-4p, because he failed to ask the VE, on the record, whether the evidence provided conflicted with the DOT, and failed to obtain a reasonable explanation for any apparent conflict.  In support thereof, Plaintiff cites to the AC's July 25, 2003 remand order, which provides as follows:

> Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy . . . . **<u>Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations</u>** (Social Security Ruling 00-4p).

(Tr. 273-274 (citations omitted) (emphasis added)).  At the administrative hearing, a VE testified; however, the ALJ did not ask

27

him whether his testimony was consistent with DOT job descriptions.

Plaintiff claims this is error.

Social Security Ruling 00-4p[8] clarifies the standards for the

use of vocational experts ("VE") and provides, in relevant part,

that:

> **Occupational evidence provided by a VE** or VS [vocational
> expert or vocational specialist] generally should be
> consistent with the occupational information supplied by
> the DOT. **When there is apparent unresolved conflict
> between VE or VS evidence and the DOT, the adjudicator
> must elicit a reasonable explanation for the conflict
> before relying on the VE or VS evidence to support a
> determination or decision about whether the claimant is
> disabled.** At the hearings level, as part of the
> adjudicator's duty to fully develop the record, the
> adjudicator will inquire, on the record, as to whether or
> not there is such a consistency. Neither the DOT nor the
> VE evidence automatically "trumps" when there is a
> conflict. The ALJ must resolve the conflict by
> determining if the explanation given by the VE is
> reasonable and provides a basis for relying on the VE
> testimony rather than on the DOT information.

SSR 00-4p (emphasis added). While Plaintiff is correct that the ALJ

did not ask the VE to consider possible conflicts between his

testimony and the DOT at the hearing; such was not required.[9]  By

_____

[8] Social Security Ruling ("SSR") 00-4p was promulgated to clarify
the SSA's standards for the use of VE and specialist testimony, and
the manner in which an adjudicator is required to identify and resolve
any conflicts between such testimony and vocational data contained in
the Dictionary of Occupational Titles and the Selected Characteristics
of Occupations Defined in the Revised Dictionary of Occupational
Titles.  SSR 00-4p makes clear, however, that neither the DOT nor the
VE testimony should automatically be accorded controlling weight.

[9] See generally Huff v. Halter, 169 F. Supp. 2d 1318 (S.D. Ala.
2001); Rembert v. Apfel, 2000 WL 1196062 (S.D. Ala. Aug. 15, 2000);
Torrey v. Apfel, 2000 WL 1375289 (S.D. Ala. July 17, 2000); Johnson v.
Apfel, 2000 WL 827928 (S.D. Ala. Jun. 7, 2000); Tucker v. Apfel, 2000

its very language, SSR 00-4p requires the ALJ to inquire about potential conflicts <u>only</u> where the VE "provides evidence about the requirements of a job or occupation." SSR 00-4p. Similarly, the AC's remand order suggests the same; namely, that before relying on VE testimony, the ALJ will identify and resolve any conflicts. <u>See</u> <u>supra</u>. Where no conflicts exist however, the ALJ is not required to so identify or resolve.

In this case, the VE did not describe the requirements of the specific jobs that he believed Plaintiff could perform despite her impairments. Rather, VE Miller testified that the sedentary, unskilled cashier position simply had no length of sitting requirements, and that he had no knowledge if there would be a certain position in which an individual such as Plaintiff would have to be seated for 3 hours or more. (Tr. 131). The ALJ was not required to ask the VE about whether this portion of his testimony conflicted with the <u>DOT</u> for the simple reason that there was no "apparent unresolved conflict" between the VE's testimony and information in the <u>DOT</u> concerning the jobs enumerated. Nor has Plaintiff suggested that any such conflict existed. <u>See generally</u> <u>Jones v. Apfel</u>, 190 F.3d 1224 (11th Cir. 1999); <u>Rutherford v.</u> <u>Barnhart</u>, 399 F.3d 546, 556-558 (3rd Cir. 2005). Accordingly, Plaintiff's argument fails. <u>Id</u>. <u>See also</u> <u>Lipson v. Barnhart</u>, 347

WL 548178 (S.D. Ala. Apr. 12, 2000); <u>Ritts v. Apfel</u>, 2000 WL 360130 (S.D. Ala. May 28, 2000); <u>Daniels v. Apfel</u>, 92 F. Supp. 2d 1269 (S.D. Ala. 2000).

F. Supp. 2d 1182 (M.D. Ala. 2004).

**V.   Conclusion**

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is recommended that the decision of the Commissioner of Social Security, denying Plaintiff's claim for period of disability and disability insurance benefits, is due to be **AFFIRMED.**

The attached sheet contains important information regarding objections to this report and recommendation.

**DONE** this the **25**th day of **September, 2006.**

                    /s/ Sonja F. Bivins
            **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.   **<u>Objection</u>**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(c); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **<u>Opposing party's response to the objection.</u>**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **<u>Transcript (applicable where proceedings tape recorded)</u>**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

     /s/SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**
